No. 22-2872

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

**Benedda Cotten; Terry Davis**,

*Plaintiffs-Appellees,*

v.

**Ryan Miller, in his individual capacity; Brian Graupner, in his individual capacity**,

*Defendants-Appellants.*

---

On Appeal from the U.S. District Court for the District of Minnesota,
The Honorable John H. Tunheim, presiding

---

## APPELLEES' BRIEF

---

**MADIA NEWVILLE LLC**
Samuel Kramer 400743
1850 IDS Center
80 S 8th St
Minneapolis, Minnesota 55402
P: 612.349.2720 F: 612.235.3357
sjkramer@madianewville.com

# SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT

The Defendant police officers forcibly entered the Plaintiffs' home based on a neighbor's vague report of loud noises. Before forcing entry, the Defendants never observed anything that was indicative of violence or distress, but instead heard the sounds of children playing. Despite having no reasonable basis for concluding that there was an emergency inside the apartment, the Defendants barged into the Plaintiffs' home without a warrant. Their stated purpose for entering the Plaintiffs' home was to investigate a possible crime.

The Plaintiffs have brought a single claim of unreasonable search under the Fourth Amendment pursuant to 42 U.S.C. § 1983. All evidence in the case shows that the Defendants violated the Plaintiffs' Fourth Amendment rights by entering the home without a warrant, with no exigent circumstances, and for reasons unrelated to their community caretaking functions. The search was plainly unconstitutional under clearly established law. The District Court therefore correctly denied the Defendants qualified immunity and granted the Plaintiffs' motion for summary judgment.

Appellees request 20 minutes for oral argument.

1

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT ....................................................................................1

TABLE OF AUTHORITIES....................................................................4

STATEMENT OF ISSUES ......................................................................6

STATEMENT OF THE CASE .................................................................8

SUMMARY OF ARGUMENT................................................................16

ARGUMENT ........................................................................................19

I.       Standard of Review ................................................................19

II.      The Defendants are not entitled to qualified immunity because it was clearly established that police officers cannot enter a home without a warrant or consent based on a report of a domestic dispute alone, and that was the only evidence of an exigency or probable cause that they had. ...........................20

         a.       It was clearly established that police officers cannot enter a home without a warrant based on only a report of a possible domestic dispute. ..................................................20

         b.       The Defendants violated the Plaintiffs' clearly established right to be free from warrantless searches of their home in the absence of exigent circumstances. ..................................27

                  i.       There was "nothing more" to indicate exigent circumstances. 33
                  1.       The Plaintiffs stood on their Fourth Amendment rights. ..........33
                  2.       No reasonable officer could have concluded Davis' "yelling" was indicative of exigent circumstances. ..................................36
                  3.       The neighbor's in-person report provided no new information. 39
                  4.       The smell of marijuana was not a factor....................................43
                  5.       Children being up late does not create exigent circumstances. 44
                  6.       The Defendants' inability to determine if people were okay does not give them authority to conduct a warrantless search of the home. 45
                  ii.      The Defendants lacked probable cause. ...................................47

III.     The community caretaking exception did not apply to the Defendants' search of the Plaintiffs' apartment because they entered to conduct a

Appellate Case: 22-2872     Page: 3     Date Filed: 11/29/2022 Entry ID: 5222121

criminal investigation and had no reasonable basis to conclude there was an emergency. ....................................................................................48

    a.    Community caretaking did not apply when officers conducted searches with an investigative purpose. ...............................................49

    b.    It was not objectively reasonable to believe that there was an emergency inside the Plaintiffs' apartment........................................51

CONCLUSION ....................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................56

CERTIFICATE OF SERVICE...............................................................57

Appellate Case: 22-2872    Page: 4    Date Filed: 11/29/2022 Entry ID: 5222121

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987)..................................................................................................6, 26

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006)....................................................................................29, 44

*Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012)............................................53

*Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)................................................6, 49

*Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021) ..............................................7, 49

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018); *White v. Pauly*, 137 S. Ct. 548, 551 (2017)...................................................................................21

*Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir. 1989))..................................25, 28

*Florida v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495 (2013) ............................................................................................................27, 28

*Graham v. Barnette*, 5 F.4th 872, 882 (8th Cir. 2021) ....................................49, 50

*Guite v. Wright*, 147 F.3d 747, 750 (8th Cir.1998) ..........................................25, 28

*Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009)......................................35

*Johnson v. Jones*, 515 U.S. 304, 320, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ....19

*Kentucky v. King*, 563 U.S. 452, 469–70, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011)..............................................................................................................34

*Lovins v. Korte*, No. 2:16-CV-00038-PLC, 2019 WL 183973, at *11 (E.D. Mo. Jan. 14, 2019), *appeal dismissed,* No. 19-1277, 2019 WL 11689743 (8th Cir. Aug. 9, 2019) ...................................................................................................22

*M.G. v. Columbia Pub. Sch.*, 990 F.3d 1145, 1147 (8th Cir. 2021).......................21

*Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013)..............................25, 28

*New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) ................................................47

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ....................................................21

*Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004) ...............29, 47

*Raines v. Counseling Assocs. Inc.*, 883 F.3d 1071, 1074 (8th Cir. 2018). .............19

*Rivas-Villegas v. Cortesluna*, No. 20–1539, 2021 WL 4822662 at *3 (U.S. Oct. 18, 2021)..............................................................................................................21

*Shelton v. Stevens*, 964 F.3d 747, 752 (8th Cir. 2020) ...........................................37

*Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ........................................................................................................................34

*Storey v. Taylor*, 696 F.3d 987, 994 (10th Cir. 2012) .......................................20, 30

*Thompson v. Dill*, 930 F.3d 1008, 1012 (8th Cir. 2019) ........................................19

*Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998)........................................46

*United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir.1989)..............................25

Appellate Case: 22-2872    Page: 5    Date Filed: 11/29/2022 Entry ID: 5222121

*United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) ...........................................28

*United States v. Chambers*, 395 F.3d 563, 577 (6th Cir. 2005) ............................34

*United States v. LaDeaux*, No. CR 11-50128-JLV, 2012 WL 1609913, at *2–4 (D.S.D. May 8, 2012) ......................................................................................24, 31

*United States v. Mays*, 993 F.3d 607, 616 (8th Cir. 2021), ....................................43

*United States v. Powell*, 379 F.3d 520, 523 (8th Cir.2004)....................................25

*United States v. Quarterman*, 877 F.3d 794, 799 (8th Cir. 2017)...................20, 22

*United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006)..................7, 49, 50

*United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012) ...........................28, 34

*United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) ...........................................30

*United States v. Scott*, 876 F.3d 1140, 1141 (8th Cir. 2017).................................40

*United States v. Smith*, 820 F.3d 356, 359 (8th Cir. 2016).....................................52

*United States v. Stachowiak*, 521 F.3d 852, 854 (8th Cir. 2008). ..........................35

*Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984)) ................................................................................................................28

## STATUTES

42 U.S.C. § 1983 ...........................................................................................................1

## CONSTITUTIONAL PROVISIONS

Fourth Amendment...........................................6, 16, 26, 27, 28, 33, 34, 35, 36, 44

Appellate Case: 22-2872    Page: 6    Date Filed: 11/29/2022 Entry ID: 5222121

# STATEMENT OF ISSUES

1. The Fourth Amendment prohibits warrantless searches of a home in the absence of exigent circumstances. A report of a domestic disturbance on its own does not create exigent circumstances. The Defendants responded to a report of a possible domestic disturbance at the Plaintiffs' home, but observed nothing that was indicative of an emergency before forcing entry. Did the District Court err in holding that under clearly established law, the Defendants violated the Fourth Amendment?

   <u>Apposite Authority</u>

   *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009)

   *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987).

2. It was previously the law of this circuit that police officers could enter a home without a warrant to perform community caretaking duties if the entry was completely divorced from a criminal investigation and they had a reasonable belief that somebody in the home needed help. The Defendants entered the Plaintiffs' apartment to "investigate" an alleged domestic dispute on the basis of a vague report of loud noises. Did the District Court err in denying them qualified immunity on these grounds?

   <u>Apposite Authority</u>

   *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)

Appellate Case: 22-2872    Page: 7    Date Filed: 11/29/2022 Entry ID: 5222121

*United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006)

*Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021)

Appellate Case: 22-2872     Page: 8     Date Filed: 11/29/2022 Entry ID: 5222121

## STATEMENT OF THE CASE

In the early morning hours of May 4, 2019, Defendants Ryan Miller and Brian Graupner were on duty with the Minneapolis Police Department. (App. 21, R. Doc. 7 at ¶ 8) The Department dispatched them to a duplex in South Minneapolis based on a 911 call. (*Id.* ¶ 9) Dispatch notified them that the caller reported hearing a verbal argument and possibly somebody being thrown around in the upper unit of her duplex, where a woman and child lived. (App. 276, R. Doc. 32-5 at Def000039) Officers Miller and Graupner did not hear the audio from the 911 call and had no additional information about the situation before they arrived. (App. 190, R. Doc. 35 at 57:10-13)

The 911 caller did not report that she had heard "domestic abuse" or a "fight," or any other version of those terms. (App. 366, R. Doc. 48-1) She simply described the noises she heard, and with the exception of saying it sounded like somebody was being thrown around, she did not characterize what she heard as anything in particular. (*Id.*; *See also* App. 276, R. Doc. 32-5 at DEF000039) She reported that a woman lived in the upper unit with a "child." (*Id.*) She made no reference to any male resident. (*Id.*)

Officer Graupner drove the cruiser to the duplex with Officer Miller in the passenger seat. (App. 206, R. Doc. 35-1 at 35:2-7) At all times relevant to the issues

8

in this case, at least one and at most times multiple Department-issued body-worn cameras recorded their actions. (App. 237, 238, R. Doc. 32-1, R. Doc. 32-3)

When they arrived at the address, their body worn cameras did not capture noises coming from the duplex other than some barking by a dog. (App. 237, R. Doc. 32-1 at 1:00-3:00) While standing outside of the house, the only voices Officer Miller heard were those of children. (App. 180, R. Doc. 35 at 19:2-6) The children did not sound like they were in any duress. (*Id.* at 19:1-11) He did not document any yelling in the report of the incident that he drafted later that day. (App. 269-71, R. Doc. 32-5 at DEF00032-34) Officer Graupner now says he heard indistinguishable yelling while outside the duplex, (App. 203, R. Doc. 35-1 at 21:21-22:7), but did not document that when he wrote his report later that day. (App. 276-78, R. Doc. 32-5 at DEF000039-41)

After exiting the police cruiser, Officer Graupner looked up into the window of the second floor of the duplex from the front yard and saw somebody spraying an aerosol can, which he inferred was intended to cover the smell of marijuana that he detected outside the building. (App. 210, R. Doc. 35-1 at 50:3-19) Officer Miller has never claimed to have smelled marijuana near the duplex himself, or to have known that there was an odor of marijuana present.

Officer Graupner also saw somebody in a dew rag. (App. 237, R. Doc. 32-1 at 2:00-2:03) He announced that observation to Officer Miller, along with the fact

that somebody was spraying aerosol near the window. (*Id.* at 2:00-3:45) Although he later told a supervising officer on the scene that he saw a child in the upper window before he and Officer Miller entered the duplex, he now admits this was untrue. (App. 221, R. Doc. 35-1 at 94:19-22)

While Officer Graupner observed those movements through the upper window, Officer Miller approached the main door to the duplex on the ground level. (App. 238, R. Doc. 32-3 at 1:45-1:50) As he walked toward the front door, Officer Miller claims to have heard, but not seen, the door close and the deadbolt on the door lock. (App. 182, R. Doc. 35 at 25:7-22) Officer Graupner admits he did not observe the door close or the deadbolt lock, (App. 208, R. Doc. 35-1 at 41:2-22), but later wrote that he heard the door slam in his incident report. (App. 276, R. Doc. 32-5 at DEF000039) No such sound is audible on the body-worn camera video. (App. 237, 238, R. Doc. 35-1, R. Doc. 35-3) The claim that somebody locked the door in response to the police arriving at the duplex is undermined by the fact that the door is supposed to be locked at all times. (App. 163, R. Doc. 48-2 at 59:14-16)

Officer Miller announced the presence of police officers and knocked on the door, before eventually kicking it several times when nobody answered the door. (App. 237, R. Doc. 32-3 at 1:50-2:13) Neither Officer Miller nor Officer Graupner observed anything outside of the apartment that was indicative of a fight, argument, altercation, or violence of any kind. (App. 195, R. Doc. 35 at 77:14-21, App. 230-

Appellate Case: 22-2872     Page: 11     Date Filed: 11/29/2022 Entry ID: 5222121

31, R. Doc. 35-1 at 132:23-133:2) Neither of them felt that the information they knew before entering the main door to the duplex gave them legal justification to enter the upper apartment. (App. 184, R. Doc. 35 at 33:24-34:12, App. 203, R. Doc. 35-1 at 23:14-24:6)

Eventually the individual on the first floor of the duplex who had called 911 opened the door and allowed Officers Miller and Graupner to enter. (App. 238, R. Doc. 32-3 at 2:53-3:44) She told Officer Miller that she had heard screaming, screeching, and thuds. (*Id.*; *see also* App. 183, R. Doc. 35 at 30:1-15) She described the sounds as "really, really aggressive," and said that the voices sounded like a woman or child and that she could not make out any of the words that were spoken. (*Id.*) She looked frightened while describing her observations. (*Id.*) She did not, however, state that what she heard was an assault or violence. (App. 189, R. Doc. 35 at 54:2-14) She never referenced any male voice in the apartment, or said that a male resident was associated with the noises she heard. (*See* App. 238, R. Doc. 32-3)

Miller concluded that the information the neighbor shared with him created exigent circumstances to justify a warrantless entry into the upper apartment. (App. 180, R. Doc. 35 at 19:17-20:12) He speculated that she had heard "the sounds of a possible physical fight, but there was definitely something happening up there," so he concluded that he needed to enter the apartment to check on the safety of the

residents. (*Id.* at 17:13-18:1) Miller now cites the following factors in support of his determination:

- The initial 911 call information that was dispatched to the police cruiser; (*Id.* at 19:17-20:12)

- The neighbor's report to him inside the building; (*Id.*)

- The movements observed by Officer Graupner in the upper window; (App. 183, R. Doc. 35 at 31:19-32:4)

- The deadbolt locking as he approached; (*Id.*)

- The long lapse in time between the 911 call and their entry into the building, which may have made it possible for a person to be injured before they arrived. (App. 180, R. Doc. 35 at 19:17-20:12)

Having concluded that there were exigent circumstances, he started walking up the stairs to the upper unit. (App. 238, R. Doc. 32-3 at 3:44) By that point he had decided he would force entry to the upper unit if the residents did not open the door for him. (App. 183, R. Doc. 35 at 30:24-31:5) He came to that conclusion without discussing it with Officer Graupner, (App. 179-80, R. Doc. 35 at 16:13-17:12), though Officer Graupner says that in his own mind, he agreed with Officer Miller's conclusion at the time. (App. 204, R. Doc. 35-1 at 25:5-13)

As Officer Miller began ascending the stairs, Officer Graupner spoke to the downstairs neighbor. (App. 237, R. Doc. 32-1 at 4:10-4:45) She told him that it had

recently been quiet in the upper unit. (App. 224, R. Doc. 35-1 at 108:22-109:4) Miller did not hear this discussion. (App. 184, R. Doc. 35 at 35:5-17) Although Officer Graupner later claimed to a supervisor that the neighbor told him that there was an injured child upstairs, he now admits she never said that. (App. 221, R. Doc. 35-1 at 94:11-18)

From the moment Officer Miller entered the building to the moment he approached the door to the upper unit, there was no sign of distress within the building. (App. 195, R. Doc. 35 at 77:20-78:6) Nobody cried out for help and there were no sounds that indicated any violence was occurring within the apartment. (*Id.*) The Officers heard no thuds. (App. 180, R. Doc. 35 at 19:12-16) The only noise they heard was the sound of children playing, without any sign of distress in their voices. (App. 184, R. Doc. 35 at 35:5-17 (citing App. 238, R. Doc. 32-3 at 4:56-4:59), App. 214, R. Doc. 35-1 at 65:4-8 (citing App. 237, R. Doc. 32-1 at 4:56-4:59)).

By the time Officer Miller reached the top of the stairs, he was "frustrated." (App. 184, R. Doc. 35 at 36:10-20) It showed. He drew his service firearm and pointed it at the door to the upper apartment as he approached it. (App. 238, R. Doc. 32-3 at 4:13) He knocked loudly on the door and said, "open the door, it's the police." (*Id.* at 4:47-4:51) When Plaintiff Benedda Cotten, who lived in the apartment, responded verbally from behind the closed door by asking why he was there, Officer Miller responded, "I'll force entry if I need to because I'm

13

investigating a possible domestic." (*Id.* at 4:51-5:13) Miller could hear both Cotten and a male voice belonging to her partner, Plaintiff Terry Davis. (*Id.* at 5:10-5:18) Davis called out in response, asking "for what?" (*Id.* at 5:13-16)

When his threat to force entry did not prompt Cotten or Davis to open the door, Officer Miller yelled, "open the fucking door." (*Id.* at 5:15-5:18) When Cotten again asked him why she needed to open the door, he yelled, "I will force entry because I believe there's a domestic going on here." (*Id.* at 5:18-5:40) Cotten said there was nobody hurt in the apartment and Davis said they just wanted to know what brought the police to their door, Graupner yelled, "then open the fucking door," adding, "I will kick it in." (*Id.* at 5:40-5:51) As he listened to Cotten and Davis talking behind the closed door, he again screamed, "I will kick this fucking door in." (*Id.* at 5:51-6:02)

After pleading with Officer Miller to "calm down," (*Id.*) Davis cracked the door open enough to see Officer Miller while blocking entry with his body. (*Id.* at 6:05-6:07) Officer Miller commanded him to "show me your hands, ya joker." (*Id.* at 6:07-6:09) He then ordered Davis to "back up" and ascended the steps toward the door. (*Id*. at 6:09-6:14) As Davis backed up, Officer Miller crossed the threshold and entered the apartment. (*Id*. at 6:19-6:21) Officer Graupner followed close behind. (App. 237, R. Doc. 32-1 at 6:21-6:24) Both Officers Miller and Graupner concede that nobody inside the apartment consented to their entry, (App. 184, R. Doc. 35 at

14

18:9-11, App. 215, R. Doc. 35-1 at 70:15-25) though their incident report states that they had been "granted entry." (App. 267, R. Doc. 32-5 at DEF000030) The sole basis they claim for entering the apartment without a warrant is exigent circumstances. (App. 180, R. Doc. 35 at 18:12-14, App. 202, R. Doc. 35-1 at 18:24-19:10)

Once inside the apartment,[1] Officers Miller and Graupner continued berating Davis and Cotten in front of their children, using curse words and threatening to have the children removed from the home. (App. 237, R. Doc. 32-1, App. 238, R. Doc. 32-3) The encounter ended when Officers Miller and Graupner arrested Davis, removed him from his home, and eventually took him to jail on a criminal charge unrelated to the alleged domestic abuse that supposedly gave rise to their warrantless entry into the apartment. (*Id.*)

---

[1] The Defendants take issue with the District Court's recitation of certain events that took place after they entered the apartment, which they argue are "irrelevant," despite themselves gratuitously laying out the allegations that led to Davis's arrest later on in the encounter. Appellants' Br. at 8–10. The Plaintiffs will not describe, in detail, everything that happened after the Defendants unlawfully entered their apartment, in order to focus on facts related to the issues raised in their Principal Brief, but do note that their explanation for the dismissal of the criminal charges they initiated against Davis is pure speculation based on no cognizable facts, *id.* at 9.

# SUMMARY OF ARGUMENT

The clearly established law in this circuit is that a report of a domestic dispute, standing alone, is insufficient to create exigent circumstances that justify a warrantless entry into a home. The Defendants in this case, Minneapolis Police Officers Ryan Miller and Brian Graupner, responded to a vague report of loud noises coming from the upper unit of a duplex where Plaintiffs Benedda Cotten and Terry Davis lived with their children. The Defendants arrived at the scene to find nothing more than the sounds of children playing. At no point while they were there did they observe any signs of distress or violence. Nevertheless, they cursed out and threatened the Plaintiffs until they opened their door, before pushing past them into the apartment without a warrant.

The Defendants now claim their entry was justified by either exigent circumstances or the now-extinct community caretaking doctrine. The District Court rejected these arguments, denying the Defendants' request for qualified immunity and finding that they violated the Plaintiffs' clearly established Fourth Amendment rights. Key to the District Court's holding was the fact that the Defendants failed to identify any legally or factually significant observations other than the neighbor's report that could possibly justify a warrantless entry.

The Defendants acknowledge that the law at the time they entered the apartment was clear: reports of domestic disputes alone are insufficient to create

exigent circumstances. Yet they claim that the District Court erred in failing to identify cases in which officers encountered the exact same minor facts that they encountered at the Plaintiffs' home. The Defendants' argument fails for two reasons. First, this court has never defined the right to be free from warrantless searches of the home with that degree of specificity when evaluating a request for qualified immunity. Second, even if it were necessary to identify precedent that involved factors other than the report of a possible domestic dispute, there were no such factors in this case. The primary factors the Defendants identify are merely the Plaintiffs standing on their right not to consent to a warrantless search of their home. Those facts are legally insignificant, as are the rest of the facts the Defendants identify as something more than the report of a possible domestic dispute. No reasonable officer facing the facts the Defendants encountered at the Plaintiffs' home would have concluded they had legal justification to enter it.

With no facts to support their exigent circumstances argument, the Defendants fall back on the now-extinct community caretaking doctrine. The District Court correctly rejected this argument too, finding that it did not apply in these circumstances because the Defendants admit they entered the apartment to investigate a crime, which precludes application of the community caretaking doctrine. The District Court also could have rejected this argument on the basis that

17

it was objectively unreasonable for the Defendants to conclude they needed to enter the apartment based on what they knew and observed.

Appellate Case: 22-2872    Page: 19    Date Filed: 11/29/2022 Entry ID: 5222121

# ARGUMENT

## I. Standard of Review

The Defendants appeal the District Court's denial of their motion for summary judgment based on the assertion of qualified immunity. Appellants' Br. at 3–4. On an interlocutory appeal of a denial of summary judgment based on qualified immunity, courts of appeals have jurisdiction to decide the "purely legal issue" of whether the facts of the case support a claim that the defendants violated a clearly established law. *See Raines v. Counseling Assocs. Inc.*, 883 F.3d 1071, 1074 (8th Cir. 2018). The standard of review on such an appeal is *de novo. Id.*

This Court's jurisdiction does not extend to the issue of "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). The Court therefore cannot review a denial of qualified immunity at summary judgment based on a disagreement over whether there is sufficient evidence in the record to create a dispute of material fact. *Thompson v. Dill*, 930 F.3d 1008, 1012 (8th Cir. 2019). The only exception to this rule is where the record "plainly forecloses the district court's finding of a material factual dispute." *Id.* (quoting *Raines v. Counseling Assocs. Inc.*, 883 F.3d 1071, 1074 (8th Cir. 2018).

Here, the District Court found there were no genuine issues of material fact. Addendum at 19. Thus the factual findings of the District Court are not subject to

19

review on appeal, because a dispute of fact was not the basis for the District Court's denial of qualified immunity.

## II. The Defendants are not entitled to qualified immunity because it was clearly established that police officers cannot enter a home without a warrant or consent based on a report of a domestic dispute alone, and that was the only evidence of an exigency or probable cause that they had.

The District Court correctly rejected the Defendants' qualified immunity defense. The clearly established law regarding warrantless searches of a home at the time the Defendants entered the Plaintiffs' apartment was that a report of a domestic dispute did not create exigent circumstances to justify a warrantless search of a home. *See Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009); *United States v. Quarterman*, 877 F.3d 794, 799 (8th Cir. 2017) ("As with guns, the fact of a domestic dispute is not necessarily enough."); *Storey v. Taylor*, 696 F.3d 987, 994 (10th Cir. 2012) ("A report of a domestic argument—standing alone—does not demonstrate exigent circumstances *per se*."). The Defendants knew of nothing more than a vague report of a possible domestic dispute when they barged into the Plaintiffs' apartment, so they violated that clearly established law.

### a. It was clearly established that police officers cannot enter a home without a warrant based on only a report of a possible domestic dispute.

A state actor sued in their individual capacity under Section 1983 is entitled to qualified immunity if either the evidence does not establish that a constitutional or statutory right was violated, or that right was not clearly established at the time of

Appellate Case: 22-2872   Page: 21   Date Filed: 11/29/2022 Entry ID: 5222121

the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is clearly established when existing precedent places the constitutional or statutory question beyond debate so that a reasonable officer would know that the conduct in question was unlawful under the circumstanced in which it occurred. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018); *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

Contrary to the Defendants' strained reading of dicta in a recent Supreme Court summary reversal, Appellants' Br. at 16–17 (citing *Rivas-Villegas v. Cortesluna*, No. 20–1539, 2021 WL 4822662 at *3 (U.S. Oct. 18, 2021) (*per curiam*)), it is well established that when determining the state of precedent for purposes of a qualified immunity analysis, courts look to "existing **circuit** precedent," "a robust consensus of cases of persuasive authority," or "in rare instances, that a general constitutional rule applies with obvious clarity to the facts at issue and carries the day…." *L.G. through M.G. v. Columbia Pub. Sch.*, 990 F.3d 1145, 1147 (8th Cir. 2021) (quotations and citations omitted) (emphasis added). Eighth Circuit precedent is therefore sufficient for establishing that a right was clearly established at the time that the Defendants allegedly violated it.

That precedent clearly established, prior to May 2019, that people have a right to be free from warrantless, nonconsensual searches of their home based on bare allegations of a possible domestic dispute in the home. In *Smith*, the Eighth

21

Circuit articulated the rule that an officer's "belief that an unarmed domestic violence suspect was inside the home does not itself justify a protective sweep." *Smith*, 586 F.3d at 580. Then in *Quarterman*, this Court cited *Smith* for the proposition that "the fact of a domestic dispute is not necessarily enough [to create exigent circumstances]." 877 F.3d at 799. By January 2019, a district court in this circuit had held that "the law was clearly established during the relevant time period that, in the absence of consent and exigent circumstances, a warrant was required to enter a home, even where a domestic dispute prompted law enforcement interaction." *Lovins v. Korte*, No. 2:16-CV-00038-PLC, 2019 WL 183973, at *11 (E.D. Mo. Jan. 14, 2019), *appeal dismissed,* No. 19-1277, 2019 WL 11689743 (8th Cir. Aug. 9, 2019).

By May 4, 2019, it was clearly established in the Eighth Circuit that a bare allegation of a domestic dispute was insufficient to create exigent circumstances justifying a warrantless entry into a person's home. Officers responding to such calls need something more, specifically something beyond "unsubstantiated suspicions," *Smith*, 586 F.3d at 580, that constitutes an "objectively reasonable basis to believe that someone within the house or curtilage is in immediate need of assistance," *United States v. Neadeau*, No. 17-CR-173 (SRN/LIB), 2017 WL 8944017, at *8 (D. Minn. Nov. 6, 2017), *report and recommendation adopted*, No.

17-CR-173 (SRN/LIB), 2018 WL 301192 (D. Minn. Jan. 5, 2018) (quotations omitted).

The District Court therefore correctly articulated the clearly established law applicable to the situation giving rise to this case when it held that

> It is well established in this Circuit that a report of domestic abuse alone cannot amount to exigent circumstances. *Smith*, 586 F.3d at 580. To reiterate, in *Smith*, the Eighth Circuit held that when police officers arrived at a calm scene, even though the officers had personally observed indications of violence, including actual injuries, and they knew a child was inside with the suspect, the officers did not have exigent circumstances. *Id*. at 579–80. Absent other indications of violence or threats of violence, this Circuit has clearly established that exigent circumstances do not exist based on a report of domestic abuse.

Addendum at 16–17.

The Defendants' main argument on appeal is that they are entitled to qualified immunity because there is no previous case involving the exact set of facts they encountered at the Plaintiffs' home. Although they acknowledge that it is clearly established in this circuit that "the fact of domestic violence alone does not necessarily create exigent circumstances," Appellants' Br. at 17, they contend that this is not a specific enough rule of law for the facts of this case. Specifically, they argue the Plaintiffs and the District Court failed to identify any case in which "the Officers knew the potential victims were still inside the apartment with the suspected abuser just minutes after the incident and the Officers were unable to determine

whether the potential victims were safe." This formulation of the qualified immunity test suffers from two major defects.

The first defect is that the scenario described by the Defendants is not the one they actually encountered. They had no indication beyond the neighbor's reports that there were any "potential victims" or any "potential abuser" in the apartment. Indeed, the reporting neighbor did not even describe a potential abuser or characterize what she heard as abuse; she merely described noises that she did not attribute to any specific person. For all the Defendants or the neighbor knew, the noises came from somebody who had been in the apartment earlier but left by the time the Defendants arrived, a situation akin to the cases the District Court cited. *See Smith*, 586 F.3d at 579–80; *United States v. LaDeaux*, No. CR 11-50128-JLV, 2012 WL 1609913, at *2–4 (D.S.D. May 8, 2012).

Furthermore, the Defendants were not unable to confirm the well-being of the residents. Two of the residents calmly spoke to them and confirmed that everybody inside was fine, which was at least implicitly affirmed by the sounds of children playing the background. The fact pattern the Defendants claim is absent from any controlling case is also absent from this one.

But even if that were not so, the Defendants' argument suffers from a second major defect. Although it is of course true that the qualified immunity analysis requires identification of a clearly established right, typically through a case

24

involving similar facts, the degree of specificity the Defendants call for is simply absent from this or any other circuit's jurisprudence on qualified immunity claims in this context.

The Defendants do not cite, and the Plaintiffs have not located, a single exigent circumstances case in this or any other circuit where a court found that qualified immunity was appropriate because no prior case had involved the specific circumstances the defendants in the case encountered. Instead, this Court has typically defined the right to be free from warrantless entry into the home absent exigent circumstances more generally. For example, in *Smith*, this Court rejected the defendant's qualified immunity defense, holding

> At the time of the incident, a reasonable officer understood that it was unlawful to enter a home without a warrant, absent consent or exigent circumstances. *See United States v. Powell*, 379 F.3d 520, 523 (8th Cir.2004); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir.1998); *cf. United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir.1989) (upholding a search where authorities entered a home to remove a previously exhibited weapon to avoid leaving children alone with it). The district court properly denied qualified immunity to Malek.

586 F.3d at 581.

In *Mitchell v. Shearrer*, another exigent circumstances case, the Court came to a similar conclusion:

> *Duncan* made clear that in the absence of exigent circumstances, an officer cannot reach over the threshold and into a person's home to forcibly effectuate a warrantless arrest. 869 F.2d at 1103 ("Duncan's version of the arrest asserts violations of clearly established constitutional rights [.]"). Accordingly, a reasonable officer would have known that at the time Mitchell tried to close

25

the door, he stood within his home and thus could not be pulled therefrom and placed under arrest in the absence of exigent circumstances.

729 F.3d 1070, 1076 (8th Cir. 2013).

Under the Defendants' formulation of the qualified immunity analysis, these courts erred by failing to then identify a case involving similar facts in which a court found there were no exigent circumstances. So for example, in *Smith*, the Defendants would have had the Court look at every single fact the officers knew in addition to the fact that there was a credible report of domestic violence, and only deny qualified immunity if there was a previous case in which each identical fact was present and exigent circumstances were not found to have existed. Of course those courts did not do so. They instead found that the right to be free from warrantless searches and seizures in the absence of exigent circumstances is clearly established, and then evaluated whether a reasonable officer would have thought there were exigent circumstances based on the facts known to the defendants.

To the extent that further analysis is necessary, it is not the analysis the Defendants demand. The controlling case on this question is *Anderson v. Creighton*, in which the Supreme Court held that the proper inquiry in exigent circumstances cases in which officers claim qualified immunity is whether a reasonable officer could have believed there were exigent circumstances in light of the facts known to them and the clearly established principles governing Fourth Amendment searches. 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987).

Here, as is discussed at length below, the Defendants knew almost nothing that was suggestive of exigent circumstances, aside from the rather vague, speculative reports from the neighbor. A reasonable officer with the knowledge the Defendants possessed would not have concluded that the scene they encountered that night indicated the presence of an emergency that merited breaching the Plaintiff's door. A reasonable officer would have concluded that the only possible evidence of exigent circumstances was the neighbor's report, and that the law is clear that such reports are insufficient, on their own, to justify warrantless entry into the home.

The *Smith* line of cases identified by the District Court clearly established the law that people have the right to be free from warrantless searches of their homes in the absence of exigent circumstances, and that no reasonable officer would conclude that exigent circumstances existed based only on a report of a domestic disturbance.

> **b. The Defendants violated the Plaintiffs' clearly established right to be free from warrantless searches of their home in the absence of exigent circumstances.**

"The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d

Appellate Case: 22-2872    Page: 28    Date Filed: 11/29/2022 Entry ID: 5222121

495 (2013) (citations and quotations omitted). A "search" under the Fourth Amendment occurs whenever an officer reaches over the threshold of a person's home. *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (citing *Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir. 1989)). Officers Graupner and Miller conducted a search under the Fourth Amendment the moment they crossed the threshold into Plaintiffs' home.

Searches of the home like the one that occurred here are subject to strict constitutional limits. Protection of privacy in the home is a paramount objective of the Fourth Amendment. The home is considered "first among equals." *Jardines*, 569 U.S. at 6. Warrantless entry into a home is therefore "presumptively unreasonable." *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998). Searches of the home are permitted under only three circumstances: (1) the officers have a warrant to enter the home, (2) a resident consents to the search of the home, or (3) "exigent circumstances." *Id.*

The exigent circumstances exception to the warrant requirement is "narrowly drawn." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Given the sacrosanct status the Fourth Amendment bestows upon the home, law enforcement can only circumvent the warrant requirement when immediate action is absolutely necessary. *Id*. They bear a "heavy burden when attempting to demonstrate an urgent need that might justify" a warrantless search. *United States v. Ramirez*, 676 F.3d 755, 760 (8th

28

Cir. 2012) (internal quotation marks omitted) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732 (1984)).

The Defendants claim they faced the exigent circumstance of a threat to an individual's life or safety. This form of the exigent circumstances exception to the warrant requirement has sometimes been called the emergency aid exception, which applies to situations where officers need to assist somebody in a home who is "seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006).

As is explained above, the clearly established law in this circuit is that a report of a domestic disturbance is insufficient on its own to give rise to the emergency aid exception, or any other form of exigent circumstances justification for a warrantless search. But that is all the Defendants had when they entered the Plaintiffs' apartment: a report of a possible domestic disturbance. They admitted during discovery that they observed nothing outside of the apartment that indicated there was ongoing violence or distress inside of it. They heard children playing and a barking dog, and saw that the lights were on and that somebody wearing a dew rag was spraying an aerosol can near a window. Exigent circumstances, these facts did not make.

*Smith* makes clear that the officers' own observations at the time they are deciding whether to conduct a warrantless search of the home are the most critical factors in the analysis. In *Smith*, the court contrasted two exigent circumstances cases

Appellate Case: 22-2872      Page: 30      Date Filed: 11/29/2022 Entry ID: 5222121

to illustrate this point. It cited *Radloff* as a case where there were exigent circumstances because of "ongoing" violence, and compared it to *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994), in which there was no evidence of an ongoing threat and only "unsubstantiated suspicions" to support a finding of exigent circumstances. *Smith*, 586 F.3 at 580. Here, the Defendants observed nothing to indicate any present or ongoing threat of danger or violence, leaving only the neighbor's report, which she admitted was outdated because it had been relatively quiet in the time since she called 911.

In a similar case, the Tenth Circuit held there were no exigent circumstances. In *Storey v. Taylor*, the police responded to a report of a loud argument at somebody's home. 696 F.3d 987, 996 (10th Cir. 2012). By the time they arrived the argument had stopped. *Id.* The Court held that there were no exigent circumstances in the absence of "additional facts that would significantly increase the likelihood of violence." *Id.*

Even in cases the Defendants cite, the courts emphasize the importance of the officers' own observations once at the scene of the alleged domestic disturbance. In *United States v. Sanders*, despite the existence of a report of abuse that came from inside the home, as opposed to somebody who merely heard possible abuse, this court's determination that there were exigent circumstances emphasized the importance of what the officers observed, "once at the scene of the domestic

30

disturbance." 4 F.4th 672, 678 (8th Cir. 2021) In *Sanders*, that included a child making panicked gestures through a window, the sound of children crying, and a victim with visible physical injuries. *Id.* The Defendants here made no such observations once at the scene of the alleged disturbance, and instead only heard children playing.

Courts in this circuit have found no exigent circumstances in situations with far more indications of potential emergencies than existed here. In *Smith*, the Eighth Circuit found no exigent circumstances when the defendant-police officer knew there was a child inside a home with a domestic violence suspect. 586 F.3d at 580. Unlike in this case, the defendant had actually independently observed evidence of violence in the form of injuries to the suspect's victim. *Id.* at 579.

In *LaDeaux*, a police officer responded to a report of domestic violence in which two intoxicated individuals were quarreling in a trailer. 2012 WL 1609913 at *2. Nobody answered the door when he knocked and he did not hear anything so he left. *Id.* About 45 minutes later dispatch received an open line call from the same trailer park in which they heard a woman crying and screaming and telling a man to stay away from her. *Id.* The same officer returned to the trailer and saw a woman he knew to be a resident in the trailer run out through the front door and the door closing behind her. *Id.* at *3. He then kicked down the door to enter the trailer. *Id.* The court held there were no exigent circumstances at the time he entered the trailer because

31

the fact that the likely victim exited the trailer obviated the need to provide emergency aid. *Id.* at *4–5. It rejected, as speculative, the officer's argument that there might have been other potential victims in the trailer. *Id.* at *5.

The facts of this case fall squarely within the rule acknowledged in *Smith* and applied in *LaDeaux*. The Defendants responded to a vague report of possible a domestic dispute in which the reporting neighbor did not identify a suspect or victim, and did not herself characterize the noises she heard as domestic abuse or violence of any kind. Once they arrived, they heard children playing and saw somebody inside spraying an aerosol can in a well-lit room that was visible from the street. Then the neighbor reiterated her previous report in less dramatic terms, omitting any reference to people being thrown around. When the Defendants made verbal contact with the Plaintiffs, they were calm and willing to talk, but unwilling to consent to an intrusive search of their home. They kept cool heads despite the Defendants' insistence on escalating the tension through foul language and threats.

This was truly a situation where the only evidence of exigent circumstances available to the police officers on the scene was a speculative report of a possible domestic dispute. Under *Smith* and its progeny, the District Court correctly held that the Defendants' decision to enter the apartment without a warrant under those circumstances violated the clearly established law in this circuit.

### i. There was "nothing more" to indicate exigent circumstances.

The Defendants identify eight factors that they contend represent the "something more" than a report of a domestic disturbance that this Court's precedent requires to create exigent circumstances. Appellants' Br. at 32–33. The District Court considered most of these factors in its order and properly rejected each one as either legally or factually deficient. Addendum at 12–14. The Defendants list fares no better under a reevaluation on appeal.

### 1. The Plaintiffs stood on their Fourth Amendment rights.

The Defendants rely most heavily on two observations they made after arriving at the Plaintiffs' home that night to support their assertion that there was something more than just a report of a possible domestic disturbance that justified their warrantless entry into Plaintiffs' home. First, they make much of the disputed allegation that the Plaintiffs locked the front security door as Miller approached the front of the duplex. Second, they emphasize the significance of the Plaintiffs' hesitance or unwillingness to open the door to their apartment once Miller began knocking. In the Defendants' telling of this story, the Plaintiffs' actions to keep the police out of their home made it reasonable for them to conclude that they had something to hide.

The District Court correctly rejected this argument. In its order, the District Court wrote, "[t]o hold that someone who invokes their Fourth Amendment rights

33

to privacy by locking the police out of their home can then be subject to a warrantless search undermines the very rights the Fourth Amendment seeks to protect." Addendum at 12–13. That reasoning is consistent with a body of case law regarding the right of individuals not to cooperate with the police, and instead "stand on [their] constitutional rights." *See Kentucky v. King*, 563 U.S. 452, 469–70, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865 (2011). Indeed, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). That right would have little meaning if by invoking it, one gave the state grounds to ignore it.

Applying this in the context of police attempting to raise residents by knocking on their door, this court has found that a refusal to answer does not create exigent circumstances that justify a warrantless entry. In *Ramirez*, this court rejected a lower court's finding that a criminal suspect opening his door but then trying to shut it once he saw the police were outside was **not** a fact that created exigent circumstances. 676 F.3d at 761–62. The panel explained,

> when the police knock on a door but the occupants choose not to respond or speak, or maybe even choose to open the door and then close it, or when no one does anything incriminating, the officers must bear the consequences of the method of investigation they've chosen. At that point, if their method fails, "'the investigation will have reached a conspicuously low point,' and the occupants 'will have the kind of warning that even the most elaborate security system cannot provide.'" *King*, 131 S. Ct. at 1862 (quoting *United States v. Chambers*, 395 F.3d 563, 577 (6th Cir. 2005) (Sutton, J., dissenting)).

34

Accordingly, crediting these officers with conducting a run-of-the-mill attempt to simply knock and gain entry, Cruz was under no obligation to allow the officers to enter the premises at that point and was likewise within his bounds in his attempt to close the door. That he did so, without more, does not bolster the claim that it was reasonable to conclude that the destruction of evidence was imminent.

*Id.* at 762. *See also Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009) ("[N]othing requires an individual to answer the door in response to a police officer's knocking.").

Here, the Plaintiffs' alleged attempts to prevent the police from entering their home carries just as little weight as in *Ramirez*. The law did not require them to answer the door when the police knocked without a warrant, and it allowed them to lock the door to prevent the police (or anybody else) from gaining entry. The Defendants cannot treat invocation of those rights as indicative of exigent circumstances. If police officers could point to a refusal to cooperate with a criminal investigation as evidence of exigent circumstances sufficient to justify warrantless searches, the Fourth Amendment would quickly lose all meaning. Instead, if they try to gain access to the residents but the residents refuse to cooperate, absent some other justification, they must bear the consequences of the method of investigation they have chosen.

The Defendants cite *United States v. Stachowiak*, in opposition to this long-standing legal principle. 521 F.3d 852, 854 (8th Cir. 2008). They claim that *Stachowiak* stands for the proposition that police officers may consider a suspect's

Appellate Case: 22-2872     Page: 36     Date Filed: 11/29/2022 Entry ID: 5222121

refusal to cooperate when evaluating whether a seizure is reasonable. Appellants' Br. at 29. That case involved a traffic stop in which the driver refused a lawful order to step out of his car. *See id.* at 856–57. That was not the situation at the Plaintiffs' door. Unlike the driver in *Stachowiak*, the Plaintiffs were under no legal obligation to comply with the order to open their door, nor of course were they obligated to leave their security door unlocked. Choosing to stand on one's Fourth Amendment rights is an entirely different act than refusing to follow a lawfully-given order, and must be treated differently as a matter of law.

### 2. No reasonable officer could have concluded Davis' "yelling" was indicative of exigent circumstances.

The Defendants next argue that Davis yelling while they threatened to kick his door down created exigent circumstances. In the Defendants' telling, although Cotten responded calmly to their knocks at the door, once they mentioned an investigation of domestic violence, Davis began yelling over her, an indication that he intended to frustrate their investigation. This argument fails because, as the District Court found, the undisputed video evidence of the encounter shows Davis and Cotten acting reasonably and not in a way that a reasonable officer would interpret as being indicative of an emergency inside the apartment. Addendum at 13–14.

The same video is in the record on appeal. The Plaintiffs invite the court to review it closely and focus especially on the period of time between when Miller

36

first knocked on the upper unit door and when he crossed the threshold. The video clearly shows that the only aggressors during this period were the Defendants. The Plaintiffs responded in a calm manner throughout the exchange, even asking Officer Miller to calm down. The Defendants can italicize the word "yell" in their brief as much as they want, but it does not make it so. The video shows Davis reasonably questioning Officer Miller's statement that the Defendants were investigating "a domestic," and then allowing Cotten to reassert control over the conversation. The video shows that, far from talking over her or trying to dominate the conversation, Davis deferred to her and allowed her to remain the primary speaker during the interaction.

The Defendants' legal arguments on this point fare poorly when viewed in the context of the facts that are clearly shown in the video evidence. The Defendants say the District Court erred by substituting its judgment for the Defendants', and should instead have simply accepted their assertion that they felt the situation was dangerous. In support of this argument, they cite a case that does not stand for that proposition at all, but rather states the simple rule that a court's review of evidence in these cases must be viewed objectively, without respect to hindsight. *See Shelton v. Stevens*, 964 F.3d 747, 752 (8th Cir. 2020). This is not a case where hindsight is necessary to conclude that the Defendants' exigent circumstances determination was unreasonable though. The video evidence shows that a reasonable officer would not

have interpreted anything he observed at the duplex that night as indicative of an ongoing emergency meriting a warrantless entry into the Plaintiffs' apartment.

Other cases the Defendants cite in support of their argument tend to illustrate just how little indication of an emergency they had compared to the typical exigent circumstances case. For example, in *United States v. Lawrence*, which the Defendants cite as a comparable situation in which a court found there were exigent circumstances, the following passage described the operative facts:

> Ms. Cardenas called 9–1–1 to ask for emergency help. The call was disconnected. A return call to the house was answered by a man, later determined to be the defendant, who asserted that he was the victim of abuse. Ms. Cardenas was protesting this characterization in the background of the conversation, but when she tried to talk directly to the dispatcher, her voice was distraught and all she could say was "He was the one...," before the line was again disconnected. Only one minute later when police arrived the house was dark and quiet with no one responding to the officers' knocks for several minutes.

236 F. Supp. 2d 953, 961 (D. Neb. 2002). The story did not end there though. After several minutes of knocking with no response, the police encountered the angry male resident, who yelled profanities at them and either kicked or threw objects at the door from the inside. *Id.* at 956–57. Eventually a 911 dispatcher got the female resident on the phone and convinced her to talk to an officer at a different door, and she appeared tearful and frightened before the male resident spotted her and yelled at her to close the door, which she immediately did. *Id.* at 957. The court found the officers were justified in entering the home because it was reasonable for them to

38

infer from the circumstances that the frightened female resident who had called 911 to request emergency assistance could be harmed by the enraged male resident who had hung up on the 911 operator, pretended not to be home for several minutes, screamed and violently beat on the door, and yelled at the female resident to stop talking to the police. *Id.* at 961–62.

Nothing like that happened at the duplex when the Defendants were there. Instead of profanities and violent beatings on the door by adult residents, they heard children playing. A comparison of the suspect's behavior as described in *Lawrence* with the supposed "yelling" by Davis in the video evidence provides a very stark contrast. Furthermore, instead of having the residents turning off all of the lights and hiding from them, the Defendants saw all the lights turned on and the residents almost immediately responding in calm voices after they started beating on the upstairs door to announce themselves. In short, they encountered nothing suggestive of the type of dangerous situation that the officers encountered in *Lawrence*, or any of the other cases Defendants cite.

### 3. The neighbor's in-person report provided no new information.

The Defendants acknowledge that the neighbor's 911 call was insufficient, in and of itself, to create exigent circumstances. Instead, they argue that when she repeated her report face-to-face while looking frightened, that tipped the balance and created justification for their entry. The District Court correctly noted that the

39

neighbor's in-person report added no new information that could lead a reasonable officer to conclude that there were exigent circumstances, and that in fact, her statement that it had been quiet for some time tended to suggest the opposite. Addendum at 4, 12.

The District Court also rejected the Defendants' argument that her frightened demeanor was a legitimate consideration, pointing out that she was not the alleged victim. Addendum at 12. Indeed, unlike a situation in a case like *United States v. Scott*, on which the Defendants rely, where exigent circumstances were found in part because a bloodied victim expressed fear to the police officers at the scene, 876 F.3d 1140, 1141 (8th Cir. 2017) the allegedly frightened witness the Defendants encountered had no first-hand knowledge of what was going on upstairs, did not herself claim to have been assaulted, and did not claim to have seen anybody being assaulted. Her demeanor added nothing to the analysis.

The Defendants now argue that the District Court erred in emphasizing that the neighbor was not the victim and therefore her report carried less weight, asking "how can this effect the exigent-circumstances calculus so long as the caller was a credible witness?" Appellants' Br. at 31. The Plaintiffs will take this opportunity to answer that question. It goes without saying that somebody who actually experiences abuse is in a better position to say whether it happened than somebody who only possibly heard it, and undisputedly did not see it. The Plaintiffs do not disagree that

40

this case might look quite different had the 911 call come from somebody inside the upper unit who had recently been assaulted, or who had watched somebody be assaulted with their own eyes. Any reasonable officer would recognize the distinction between that kind of scenario, in which a direct participant in the assault or an eyewitness to it reports abuse, and the scenario the Defendants encountered, in which an ear-witness described "aggressive" sounds such as screeches and thuds, but herself did not characterize those sounds as domestic abuse, a fight, or violence. The former scenario is strong evidence of domestic abuse, whereas the latter is "unsubstantiated suspicion[]" that does not create exigent circumstances. *Smith*, 586 F.3 at 580.

The neighbor's reports also did not provide the information the Defendants now claim it did. Most notably, the neighbor never used the terms "domestic abuse," "violence," or even "fight," or anything similar. She never characterized what she heard as criminal, instead limiting her descriptions to the actual sounds she heard, which were screeching and yelling, and thuds that may have been the sounds of somebody being thrown around.

Also absent from either the 911 call or the subsequent in-person report by the neighbor was any reference to a man being in the apartment. The Defendants completely ignore this fact, treating it as a given that the neighbor was reporting that Davis, the male resident of the home, was the abuser, and that Cotten or the children,

were the abused victims. The neighbor made no allegation about who she heard committing abuse, or indeed whether she even heard a male voice in the apartment. She certainly did not provide sufficient information for the Defendants to conclude that a male resident was the "suspect," as the Defendants characterize him now. In fact, she only stated that there was a woman and a child in the upper apartment.

This is significant for three reasons. First, it reduces the significance of any claim that Davis talked over or controlled Cotten. If the Defendants had no way of knowing who was the suspect and who was the victim, Davis talking over Cotten is of little evidentiary value at all. Second, it calls into the question whether the people supposedly responsible for the ruckus the neighbor reported were still in the apartment. The Defendants now emphasize that their knowledge that Davis and Cotten were still both in the apartment somehow solidified their sense that there was an ongoing danger, but they had no way of knowing, from the neighbor's report, whether the voices they heard behind the door belonged to the individual or individuals who were involved the dispute the neighbor reported. Third, it calls into question the accuracy of the neighbor's report. The neighbor made no mention of a male resident or a male participant in the shrieking, yelling, or thuds that she heard, but soon after Miller knocked on the door, he heard a male voice. That should have indicated to him that the neighbor may not have had her facts straight, or at least that she did not know what was going on inside the apartment.

42

#### 4.  The smell of marijuana was not a factor.

The Defendants argue, in contradiction of their own testimony, that the alleged smell of marijuana near the Plaintiffs' residence helped to create exigent circumstances so as to justify their warrantless entry. The District Court rejected this argument because Graupner admitted it played no role in the decision to enter the Plaintiffs' home, and also because there is nothing about the smell of marijuana that indicates a likelihood of violence in the vicinity. Addendum at 12. Equally significant though, is the fact that there is no evidence in the record that Officer Miller, the officer who made the initial decision to enter the Plaintiffs' apartment, noticed or knew that there was an odor of marijuana near the home, or that it could be attributed to the Plaintiffs' unit of the duplex. Officer Miller did not testify regarding this alleged fact and did not submit an affidavit swearing to it. He also—like Officer Graupner—did not mention the smell of marijuana in his report from the incident.

The record is therefore bereft of any evidence that Miller knew of the smell of marijuana in the vicinity at the time he entered the Plaintiffs' apartment. Because the analysis of the constitutionality of Miller's entry into the apartment is limited to the facts known to him at the time he entered, *see United States v. Mays*, 993 F.3d 607, 616 (8th Cir. 2021), neither the District Court nor this Court should consider the alleged odor of marijuana. Thus even if this Court concluded that the smell of

marijuana did or could contribute to a reasonable belief that there were exigent circumstances, this would only potentially impact the analysis of Graupner's conduct, not Miller's. Furthermore, even with respect to Graupner, the omission of the smell of marijuana from his report at least raises a question of fact as to whether he truly detected the odor outside of the building. Should this Court find the odor significant to the Fourth Amendment analysis, the proper course would be to remand and allow a jury to determine the credibility of his allegation.

### 5. Children being up late does not create exigent circumstances.

Both below and on appeal, the Defendants have emphasized the fact that the children in the home were awake at 1:30 a.m. The Defendants do not explain the significance of this observation, and certainly do not cite any case law for the proposition that kids being up past their bedtime is indicative of somebody in the home being "seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 400.

The bare recitation of this fact without any context also omits critical information. First, the Defendants knew nothing about the age of the children in the home, so had no way of knowing whether they were of an age where 1:30 a.m. is late, but not particularly unusual. Second, the sounds they heard were not children in distress, but rather children playing. This would seemingly contradict any images of injured residents that the Defendants had conjured up in their minds based on the

911 report. Presumably children do not normally play at the scene of domestic violence where somebody has been seriously injured. A reasonable officer would not only **not** have considered any of this information to be indicative of an emergency, but would have actually recognized that it tended to suggest there was no legitimate cause for concern.

### 6. The Defendants' inability to determine if people were okay does not give them authority to conduct a warrantless search of the home.

The final, catch-all factor on the Defendants' list is that they were unable to determine from outside the door whether everybody inside the apartment was "OK and not in danger." As an initial matter, this is at best a disputed fact, insofar as both the Plaintiffs told the Defendants everybody inside was okay, and they could hear the sounds of children playing throughout their time in the vicinity of the apartment. These were strong indications that a reasonable officer would draw upon to conclude that everybody inside was, in fact, "OK and not in danger." Indeed, the Defendants' unconstitutional search confirmed just that.

More significantly though, this supposed fact in the case is really just a restatement of the first issue discussed above: that the Plaintiffs had the right to refuse to allow the Defendants into their home, and invoking that right did not give the Defendants authority to ignore it. Taken to its logical extreme, if the fact that police officers cannot tell if people inside of a home are safe because those people

45

do not open the door creates exigent circumstances to conduct warrantless searches, then there is virtually no end to the state's authority to enter citizens' homes. Finding as such would contradict centuries of jurisprudence recognizing the sanctity of the home.

The Defendants seek to elide this by referring to the people inside the apartment as potential victims. This ignores all the evidence they observed at the scene, all of which suggested that whatever commotion the neighbor had heard earlier had subsided, and in its place was a rather mundane—if possibly later-than-normal—family evening at home, with children playing and parents watching television. Simply put, they had no evidence that there were any "potential victims" in the apartment.

Lacking any Eighth Circuit case law in which a factor such as this was dispositive, or even discussed, in an exigent circumstances analysis, the Defendants turn to out-of-circuit authority, citing *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998). It is true the *Tierney* featured more similar facts to this case than most of the other cases they previously cited that the District Court found to be clearly distinguishable, but *Tierney* also involved a number of facts that distinguish it from this case. First, the neighbors reporting the alleged domestic abuse were described as "experienced observers" who knew the situation well and had knowledge of previous instances of violence in the home. *Id.* Second, the officer arrived at a home

46

reported to be just recently active and noisy to find a completely silent scene. *Id.* Third, he found that there was a broken window pane on the first door that he approached. *Id.*

None of these facts, or anything similar, was present at the Plaintiffs' apartment. The neighbor who reported the alleged disturbance provided no details of previous incidents or claimed to have any historical knowledge of what might be going on in the Plaintiffs' apartment. The Defendants arrived to find not silence, but the sounds of children playing with all of the lights on in the house. Finally, there was nothing akin to a broken window to indicate a recent physical altercation. Unlike in *Tierney*, where the officer at least had some arguable reason to suspect that somebody might be harmed inside the home and had no ability to check without entering, there were no such indications at the Plaintiffs' apartment, and the Defendants did not need to enter to check on anybody.

### ii. The Defendants lacked probable cause.

Finally, the Defendants lacked probable cause to believe any crime had occurred or was occurring at the time they entered the Plaintiffs' apartment. To conduct a warrantless search of a home, police must have both probable cause to believe a crime has been committed **and** exigent circumstances. *Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004). Officers must have "arguable

probable cause" in order to benefit from qualified immunity. *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015).

The Defendants had no arguable probable cause at the time they entered the Plaintiffs' apartment. The Defendants correctly point out that the District Court did not address probable cause in its order, but the reason for that seems to be that the same factual basis for which it found there were no exigent circumstances would also lead a reasonable officer to conclude there was no probable cause. The only evidence of any crime that the Defendants faced prior to entering the apartment was the neighbor's vague report, which did not identify a specific suspect or potential victim, or even describe a possible suspect by sex or gender. They made no independent observations of a potential crime once they arrived at the scene. They had no information on which to reasonably base a conclusion that somebody in the apartment had committed a crime, and therefore lacked arguable probable cause.

### III. The community caretaking exception did not apply to the Defendants' search of the Plaintiffs' apartment because they entered to conduct a criminal investigation and had no reasonable basis to conclude there was an emergency.

The Defendants also seek refuge in the now-extinct community caretaking exception to the warrant requirement for searches of homes. The District Court properly rejected this defense because the facts preclude the application of that now defunct doctrine to this case.

48

### a. Community caretaking did not apply when officers conducted searches with an investigative purpose.

The Supreme Court has recognized a community caretaking exception to the warrant requirement for police activities which are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). That exception arose in the context of certain searches of automobiles, but this court later extended it to cover some searches of the home. *See United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). That exception to the warrant requirement applied in situations unrelated to criminal investigations in which officers needed to enter a home based on a "reasonable belief that an emergency exist[ed] requiring his or her attention." *Id.*

After the events that gave rise to this case, but before the District Court ruled on the motions for summary judgment, the Supreme Court held that the community caretaking doctrine does not apply to searches of the home. *Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021). However, because the qualified immunity analysis requires application of the legal rules that were in existence at the time the action was taken, the District Court correctly evaluated whether the Officers were entitled to qualified immunity under the community caretaking exception. *Graham v. Barnette*, 5 F.4th 872, 882 (8th Cir. 2021).

The District Court correctly held that the community caretaking exception did excuse the Defendants' conduct. Both the Supreme Court, in its automobile search cases involving the community caretaking exception, and this Court, in its cases applying the exception more broadly, have emphasized the crucial factor that makes such searches reasonable is that they are completely divorced from any criminal investigation. The District Court held that the Defendants' repeated statements—before, during, and after their entry into the apartment—that they were investigating a "possible domestic," precluded the claim that their entry was totally divorced from their criminal investigation. Addendum at 18.

The cases the Defendants cite in support of their community caretaking argument do not alter this conclusion. In *United States v. Smith*, the officers had already apprehended the suspect when they entered his home to search for a missing person they thought they had spotted through a window. 820 F.3d 356, 359 (8th Cir. 2016). Under those circumstances, this court was satisfied that their purpose in entering the home fell within the community caretaking exception because it was obviously divorced from any criminal investigation and was instead aimed at aiding a member of the community. *Id.* at 359–61.

The panel acknowledged a distinction between that case and the earlier *Smith* case that established there are no exigent circumstances based on a report of a possible domestic dispute. *Id.* at 361–62. In the earlier *Smith* case, the officers had

Appellate Case: 22-2872    Page: 51    Date Filed: 11/29/2022 Entry ID: 5222121

"entered the residence to look for unknown, dangerous individuals as part of a protective sweep," whereas in the latter *Smith* case there was no suspect for whom to search because he was already in custody. *Id.* It was therefore the absence of any potential investigative purpose that distinguished a reasonable search under the community caretaking exception to an unreasonable search under the exigent circumstances exception.

### b. It was not objectively reasonable to believe that there was an emergency inside the Plaintiffs' apartment.

Even if the Defendants' own words regarding their reason for entering the apartment did not foreclose their community caretaking argument, the rest of the facts of the case do. Under the community caretaking doctrine, a police officer could enter a residence without a warrant as a community caretaker where the officer had a reasonable belief that an emergency existed requiring his or her attention. *Quezada*, 448 F.3d at 1007; *see Graham*, 5 F.4th at 882. For all the reasons discussed above with respect to exigent circumstances, the Defendants lacked any objectively reasonable belief that an emergency existed at the time they entered the Plaintiffs' apartment.

To summarize, the Defendants knew little more than that there had been loud noises in the apartment 15-20 minutes earlier in the evening, and that a downstairs neighbor thought they sounded like somebody being thrown around. Beyond that,

51

they observed that nobody was attempting to flee the scene, there were no visual or auditory signs of violence or distress, the lights were on in the apartment and an adult was spraying an aerosol can near a window in clear view of the street, children were playing and sounded like they were in no distress, and the woman they knew lived in the apartment answered them at the door in a calm voice to say that everybody inside was doing just fine. Just as no reasonable officer would conclude that these facts added up to exigent circumstances, no reasonable officer would conclude that an emergency existed at the time they entered the apartment that required them to exercise their community caretaking duties.

Were the doctrine as broad as the Defendants claim it is, it would be difficult to understand how *Smith* remained good law through the development of the community caretaking doctrine in this circuit. In *Smith*, there is no discussion of the community caretaking doctrine. *See Smith*, 586 F.3d 576. If the community caretaking exception were as broad as the Defendants argue here, such that it would allow for a warrantless search of a home in response to the facts they encountered at the Plaintiffs' apartment, it logically would have had to be applicable to the facts of *Smith*, where a known domestic abuser who had assaulted a victim earlier that night was known to be in a home with vulnerable children. The fact that the Eighth Circuit did not extend the community caretaking exception to the facts of *Smith* demonstrates that it was not applicable in situations like the one before the Court

52

here, where the police entered an apartment to conduct a criminal investigation of domestic violence.

The *Burke v. Sullivan* case the Defendants cite does not bolster their argument. There, the police entered a home to check on the welfare of a resident who multiple eyewitnesses had seen be assaulted by another resident in the home just moments earlier, hitting her head on a wall in the process. 677 F.3d 367, 372 (8th Cir. 2012). The same witnesses described the assailant as intoxicated, aggressive, and threatening to fight or harm people around him. *Id.* at 369–70. The officers saw physical evidence of the assailant's recent acts of violence on a known victim, and knew that the assailant had just entered the residence where the other victim was located. *Id.*

No such facts exist here. The Defendants had no eyewitness accounts of anybody being harmed, and observed nothing themselves that was indicative of any ongoing harm or violence taking place in the apartment. Any purported concern about an emergency was purely speculative, in contrast to the hard facts on which the officers based their community caretaking search in *Burke*.

Finally, *Sanders*, discussed above, is equally distinguishable from the facts of this case in the context of the community caretaking exception. In that case, the police themselves saw a panicked child in the window, heard a child who sounded like she was in distress, saw a recently-injured victim of an assault, and had a report

Appellate Case: 22-2872     Page: 54     Date Filed: 11/29/2022 Entry ID: 5222121

from inside the house that there was a frightening altercation taking place. 956 F.3d at 537.

The Defendants observed nothing like this. They heard children playing and had nothing more than a neighbor's description of loud noises on which to base their conclusion that there might be an emergency. Based on the facts they knew at the time they entered the Plaintiffs' apartment, it was not reasonable for them to believe that there was an emergency that required their immediate attention. The community caretaking exception is therefore inapplicable to the facts of this case.

Appellate Case: 22-2872   Page: 55   Date Filed: 11/29/2022 Entry ID: 5222121

# CONCLUSION

The District Court correctly rejected the Defendants' qualified immunity defense. It was clearly established law that police officers cannot conduct warrantless searches of homes based on nothing more than a report of a potential domestic disturbance. The Defendants have not identified any legally or factually significant evidence of an emergency other than a neighbor's speculative report of loud noises to justify a warrantless entry under either the exigent circumstances or community caretaking exceptions to the warrant requirement. This Court should affirm the District Court's denial of Defendants' Motion for Summary Judgment and remand the case for a trial on damages.

Dated: November 29, 2022        MADIA NEWVILLE LLC

                                        _/s/ Sam Kramer_____
                                        Samuel Kramer
                                        1850 IDS Center, 80 S. 8th St.
                                        Minneapolis, MN 55402
                                        P: 612.349.2720 F: 612.235.3357
                                        sjkramer@madianewville.com

                                        *Counsel for Plaintiff-Appellee*

Appellate Case: 22-2872    Page: 56    Date Filed: 11/29/2022 Entry ID: 5222121

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is typed in Microsoft Word 2016 using 14-point type and "Times New Roman" proportionally-spaced font. The length of this brief is, with allowed exclusions, 12,059 words.

I further certify that the electronic versions of this brief provided to the Court and parties has been scanned with Symantec Endpoint Protection and has been found to be virus-free.

_/s/ Sam Kramer_____
Samuel Kramer
Attorney for Appellees Benedda Cotten and Terry Davis

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Sam Kramer_____
Samuel Kramer
Attorney for Appellees Benedda Cotten and Terry Davis